[Cite as *State v. Ivery*, 2023-Ohio-3495.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

     Plaintiff-Appellant,                      :
                                             No. 23AP-92
v.                                                     :     (C.P.C. No. 22CR-1293)

Jerry L. Ivery,                                        :     (REGULAR CALENDAR)

     Defendant-Appellee.                        :

D E C I S I O N

Rendered on September 28, 2023

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers* for appellant.

**On brief:** *Kimberlyn L. Seccuro* for appellee.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendant-appellee, Jerry L. Ivery, was seated in an idle vehicle near a suspected drug house when a police cruiser parked directly behind him. Before the police officer reached the driver's window of the vehicle, Mr. Ivery exited the vehicle and walked away. Even though the officer recognized he did not have a lawful basis to detain or arrest Mr. Ivery and could tell Mr. Ivery did not want to speak with him, the officer nonetheless followed Mr. Ivery and attempted to investigate him by lodging questions at Mr. Ivery during the pursuit. While continuing to walk away, Mr. Ivery answered some of those questions. Once additional officers arrived on the scene, Mr. Ivery began to run. The pursuing officer caught up to Mr. Ivery, physically restrained him, and searched his person. He found a firearm in the pocket of Mr. Ivery's jacket, which formed the basis for the two felony gun charges brought in Mr. Ivery's accompanying case.

{¶ 2}   After concluding the investigative stop was unlawful, the Franklin County Court of Common Pleas issued an order suppressing all evidence—namely, the firearm— which followed the stop.   Plaintiff-appellant, the State of Ohio, now appeals from that February 6, 2023 judgment.   For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL OVERVIEW

{¶ 3}   On March 28, 2022, Mr. Ivery was indicted by a Franklin County grand jury with carrying a concealed weapon, in violation of R.C. 2923.12(A)(2), a felony of the fourth degree, and having weapons while under disability, in violation of R.C. 2923.13, a felony of the third degree.  These charges were based on evidence—a loaded firearm—recovered from the warrantless search of Mr. Ivery's person by Columbus Police Department ("CPD") Officer Dayne Linhart on January 3, 2022.

{¶ 4}   Mr. Ivery moved to suppress the firearm, arguing it was obtained in violation of the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.  (Sept. 26, 2022 Mot.)  In his motion, Mr. Ivery contended that Officer Linhart did not have probable cause to arrest him or reasonable, articulable suspicion to stop him under *Terry v. Ohio*, 392 U.S. 1 (1968).

{¶ 5}   In its written response, the state argued the encounter between Mr. Ivery and Officer Linhart was consensual and did not rise "to the level of a seizure or detainment." (Oct. 10, 2022 Memo Contra at 3-4.)   The state further contended that, during this consensual encounter, Officer Linhart "gained reasonable suspicion that [Mr. Ivery] was engaged in criminal activity," thus premising the lawfulness of Mr. Ivery's prolonged detention and the officer's warrantless search of Mr. Ivery's person on *Terry*.  (Memo Contra at 4-6.)  And, in the alternative, the state posited that even if the evidence was improperly obtained, the good faith exception to the exclusionary rule should nonetheless apply. (Memo Contra at 6-8.)  Mr. Ivery filed no written response to the state's arguments opposing his suppression motion.

{¶ 6}   At the January 31, 2023 suppression hearing, the state presented testimony from Officer Linhart about the stop, prolonged detention, and search of Mr. Ivery's person. The prosecutor played a recording from Officer Linhart's body-worn camera, which depicted his interaction with Mr. Ivery and showed his pat-down search of Mr. Ivery's person.  (*See* Jan. 31, 2023 Tr. at 21. *See also* State's Ex. A.)

{¶ 7}    During her cross-examination of Officer Linhart, Mr. Ivery's trial counsel replayed the body camera recording and questioned Officer Linhart about the footage. (Tr. at 49-53, 57-59.) The defense also produced Officer Linhart's written report relating to this incident, questioned him about its contents, and compared his report's description of the encounter with Mr. Ivery to the events depicted on his body-worm camera footage. (Tr. at 46-54. *See* Def.'s Ex. A.)

## A. Evidence and Testimony Presented at the Suppression Hearing

{¶ 8}    At the suppression hearing, Officer Linhart testified that his involvement in this matter began on January 3, 2022 when Detective J. Tabor—a plain-clothes narcotics detective—asked him and other on-duty patrol officers during their pre-shift rollcall table meeting[1] to "check up on" a purportedly suspicious vehicle in the Hilltop area. (Tr. at 13-15, 27.) Ultimately, Officer Linhart was charged with this task. (*See* Tr. at 15-16.)

{¶ 9}    At the meeting, Detective Tabor and other narcotics officers described seeing a Dodge Challenger parked just north of Sullivant Avenue on Wrexham Avenue while surveilling a suspected drug house. (*See* Tr. at 13, 31.) Officer Linhart acknowledged being told the narcotics detectives were "really interested in all the activity" in this area because they had observed a significant volume of foot traffic going into and around that alleged drug house. (*See* Tr. at 13-14. *Compare* Tr. at 31-32.) Detective Tabor told the officers he believed the parked Dodge Challenger "was suspicious" because an individual had been sitting in it "for approximately 30 minutes" near "a known narcotics house" and would "duck down, kind of hide himself from sight" "any time a police cruiser drove by[.]" (*See* Tr. at 13-14. *See also* Tr. at 54, 62-63.) But, on cross-examination, Officer Linhart acknowledged the narcotics detectives who allegedly witnessed the Challenger's occupant engage in this purported ducking behavior would have been driving unmarked vehicles, not cruisers, at the time such observations were made. (Tr. at 35.)

{¶ 10}   After the rollcall meeting concluded, Officer Linhart activated his body-worn camera and drove his cruiser from the substation to the area where Detective Tabor described the suspicious vehicle was parked. (Tr. at 15-16.) At the hearing, Officer Linhart

---

[1] Officer Linhart explained these pre-shift meetings with detectives were typical because CPD's detectives "watch something prior to [patrol officers] starting [their] shift[s]," which ensures the officers "have something set up" to do when their shift begins. (Tr. at 13.)

conceded he went to this location for the purposes of conducting a "48A stop," which he explained is CPD's ten-code for a suspicious person in a vehicle. (Tr. at 28-29. *See also* Tr. at 58-59.) Officer Linhart also acknowledged that Detective Tabor had given him the license plate number for the vehicle the detectives wanted him to investigate. (Tr. at 29-31; Def.'s Ex. A at ¶ 2.) Although Officer Linhart did not recall running the Challenger's license plate number in his cruiser's computer system before he interacted with Mr. Ivery that day, he conceded that "[i]f [he] was given the tag[,] [he] probably" ran it. (Tr. at 29-30.) And, Officer Linhart agreed that if he did, in fact, run the Challenger's license plate number in his cruiser's system, nothing of significance resulted. (*See* Tr. at 29-31.)

{¶ 11} Officer Linhart arrived at the described location at 3:26 p.m. and observed the described vehicle legally parked on the residential street "right where [Detective Tabor] said, just north of Sullivant Avenue on Wrexham[,]" in the Hilltop neighborhood. (Tr. at 15-16, 27. *See also* Tr. at 34, 36-37; State's Ex. A.) At the hearing, Officer Linhart testified he considered this to be a "high-crime area." (Tr. at 17, 27, 62-63.)

{¶ 12} Without activating his overhead lights or siren, Officer Linhart pulled his cruiser behind the parked Challenger. (*See* Tr. at 16, 36-37, 60.) At the hearing, Officer Linhart agreed on cross-examination he did not personally witness the occupant of the Challenger engage in the "ducking" behavior the narcotics detectives described. (*See* Tr. at 31, 35-36.) Nor did he observe a high volume of foot traffic inside or around the home the Challenger was parked in front of, or "any drugs change hands" (i.e., sold) outside of the home. (*See* Tr. at 31-33.) And, Officer Linhart admitted he never saw Mr. Ivery enter or exit the suspected drug house. (*See* Tr. at 33.) Indeed, he conceded that when he arrived at the scene, he had not received any information to suggest Mr. Ivery had committed, was committing, or was about to commit any crime. (*See* Tr. at 33-38. *See also* Tr. at 60-61.)

{¶ 13} After the cruiser parked, Mr. Ivery immediately exited the Challenger and began walking away from the vehicles. (Tr. at 16, 35.) At the hearing, Officer Linhart conceded he had no lawful basis to stop Mr. Ivery when he exited the Challenger and began walking away. (Tr. at 37-38.)

{¶ 14} In furtherance of his intention to investigate Mr. Ivery that day, Officer Linhart exited his cruiser and attempted to engage Mr. Ivery while Mr. Ivery was walking away. (*See* State's Ex. A; Tr. at 16, 35-38.) The body camera recording shows that, while

attempting to catch up to Mr. Ivery, Officer Linhart yelled out to Mr. Ivery, "How ya doin' man? My name's Officer Linhart." (*See* State's Ex. A. *See also* Tr. at 39.) As Officer Linhart got closer to him, Mr. Ivery turned around and began walking backwards away from the officer (described by Officer Linhart as "blading his body") while answering the officer's perfunctory questions—how he was doing ("alright"), what he was working on that day ("about to go home"), where he lives ("right here," while pointing at an apartment complex), and what his address is ("[a]partment 15"). (State's Ex. A. *See also* Tr. at 18, 39-46, 24.)

{¶ 15} Officer Linhart acknowledged it was obvious that Mr. Ivery did not want to talk to him and repeatedly tried to walk away. (*See* Tr. at 18, 40-41, 67-68.) Officer Linhart admitted he nonetheless continued to follow and attempt to engage Mr. Ivery for the purpose of investigating him. (*See* Tr. at 40-41, 45-46, 67-68.) Notably, Officer Linhart conceded he still did not have a lawful basis to detain or arrest Mr. Ivery at this point during the encounter. (*See* Tr. at 42-44.)

{¶ 16} After Mr. Ivery briefly stopped and pulled down his face mask, Officer Linhart asked if he had an identification card on him. (*See* State's Ex. A; Tr. at 45.) Mr. Ivery stated he did not, turned into an alley, and walked away from the officer towards the building he identified as his residence. (*See id.*) As depicted in his body-worn camera footage, Officer Linhart continued to follow and attempt to engage him. (State's Ex. A. *See also* Tr. at 45-46.) He asked Mr. Ivery if he owned the vehicle parked on the street. (*See id.*) In response, Mr. Ivery turned slightly towards Officer Linhart—e.g., bladed his body towards the officer—stated he did not, turned completely around again, and continued walking down the alley away from the officer. (*See id.*) Officer Linhart agreed he still had no lawful basis to arrest or detain Mr. Ivery at this point. (*See* Tr. at 44-46.) Nevertheless, Officer Linhart continued following and attempting to question Mr. Ivery. (*See* State's Ex. A; Tr. at 46.) And although Mr. Ivery did not turn around, did not respond, and continued walking away from the officer, Officer Linhart continued pursuing Mr. Ivery anyway. (*See id.*)

{¶ 17} The body camera footage shows it is at this point during the encounter that Mr. Ivery started to run, which prompted Officer Linhart to chase after him. (*See* State's Ex. A. *See also* Tr. at 61-62.) Although not visible in his body camera recording, Officer Linhart testified that Mr. Ivery began to run down the alley when he saw another cruiser arrive at the scene. (Tr. at 18. *See also* Def.'s Ex. A. at ¶ 3.)

**{¶ 18}** Officer Linhart initially testified that Mr. Ivery "kept his right hand in his jacket [pocket] pretty much the entire time[]" during the encounter. (Tr. at 19, 48.) That account is echoed in his report. (*See* Def.'s Ex. A at ¶ 4.) Both are belied, however, by his body camera footage. (*See* State's Ex. A. *See also* Tr. at 48-52, 65.) Indeed, Officer Linhart's body camera recording shows—and notwithstanding the cold January temperature—both of Mr. Ivery's hands are visible ***outside*** of his jacket pockets the entire time preceding the chase. (*See* State's Ex. A. *See also* Tr. at 48-52.) During most of their conversation, Mr. Ivery can be seen on the body camera footage holding his cell phone in his right hand and using his left hand to point, gesture, and adjust his face mask. (State's Ex. A. *See also* Tr. at 50.) And, on cross-examination, Officer Linhart admitted his prior testimony and report statement claiming Mr. Ivery's right hand was in his jacket pocket before Mr. Ivery began running could not be reconciled with his body-worn camera footage. (*See* Tr. at 48-52.) In any event, Officer Linhart agreed he did not have a lawful basis to arrest or detain Mr. Ivery prior to his flight. (*See* Tr. at 38-46, 53-54, 64-65.)

**{¶ 19}** Officer Linhart also described Mr. Ivery keeping "his [right] hand in his pocket" while the two men were running, which appeared to the officer as though "something heavy was in there, just the way that it was pulling harder on the right side of his jacket than his left side." (Tr. at 19. *See also* Tr. at 52-53; Def.'s Ex. A at ¶ 4.) Officer Linhart recounted thinking "it was weird that [Mr. Ivery] was running with a hand in his pocket because nobody usually does that." (Tr. at 19.) Officer Linhart's body-worn camera footage is unclear and inconclusive as to whether Mr. Ivery's right hand was, in fact, in his jacket pocket while he was running.[2] (*See* State's Ex. A. *See also* Tr. at 52-53.) We note, however, the footage does not clearly show the right side of Mr. Ivery's jacket being heavily weighed down, as compared to the left side. (*See* State's Ex. A.) Also notable is Officer Linhart's concession that he did not see a gun—or, for that matter, any contraband—in Mr. Ivery's possession at any point prior to or while the two men were running. (Tr. at 56.)

**{¶ 20}** After the two men ran out of the alley, Officer Linhart testified that Mr. Ivery "slowed [down] his speed and either slipped on ice [or] [the officer] slipped on ice and [the two men] ended up running into each other[.]" (Tr. at 20. *See also* Def.'s Ex. A at ¶ 4.) The

---

[2] Even if it was, we note that because keys, wallets, cell phones, and other personal effects are often carried in jacket pockets, he could have been holding any number of these lawful items while he was running.

body-worn camera footage is again unclear and inconclusive as to whether Mr. Ivery was tackled or fell to the ground by virtue of one or both men slipping on ice, losing balance, or otherwise. (*See* State's Ex. A.) No patches of ice or snow are visible on the roadway; rather, there are several puddles suggestive instead of melting. (*See id.*)

{¶ 21} In his report, Officer Linhart described "grabb[ing] Mr. Ivery's feet prior to hitting the ground." (Def.'s Ex. A at ¶ 4.) At the hearing, Officer Linhart testified that he "ended up on top of [Mr. Ivery] [while] controlling his hands[,]" which, at that point, were not in either of Mr. Ivery's jacket pockets. (Tr. at 20.) These events are not reflected on Officer Linhart's body-worn camera footage, however, because it "flew off" of him when he was in the process of detaining Mr. Ivery. (*See* Tr. at 20-21; State's Ex. A.)

{¶ 22} Officer Linhart testified he detained Mr. Ivery "for fleeing." (Tr. at 53-54.) More specifically, Officer Linhart opined that he had reasonable, articulable suspicion to conduct an investigatory detention because Mr. Ivery was "[o]utside [of] a known narcotics drug house," ran away "upon the sight of more police officers," and had "blad[ed] his body" when speaking to Officer Linhart before the flight occurred. (*See* Tr. at 53-54. *See also* Tr. at 18, 39, 63-66.) Officer Linhart also emphasized the "high crime" he associated with the area. (*See* Tr. at 17, 27, 62-63.)

{¶ 23} Moments after Officer Linhart detained Mr. Ivery, additional officers arrived and searched Mr. Ivery's person. (*See* Tr. at 20; Def.'s Ex. A at ¶ 4.) On cross-examination, Officer Linhart testified he performed this search incident to Mr. Ivery's arrest. (Tr. at 56.) But, on re-direct examination, Officer Linhart testified—mostly by answering the trial prosecutor's leading questions—that his search of Mr. Ivery's person was actually a safety pat-down (or *Terry* frisk). (Tr. at 65-66.) He explained that he conducted this type of pat-down search "[f]or weapons and especially in narcotics activity." (Tr. at 65.) Officer Linhart's body-worn camera did not capture the search and his report does not shed any light on what justification the officer relied on for the warrantless search. Of note, Officer Linhart did not testify or state in his report he believed Mr. Ivery was armed and presently dangerous before he conducted the warrantless search. *Compare State v. Oliver*, 10th Dist. No. 21AP-449, 2023-Ohio-1550, ¶ 84-85, 90-95.

{¶ 24} During the warrantless search of Mr. Ivery's person, a gun containing 14 rounds of ammunition in the magazine and 1 round in the chamber was recovered from the

right pocket of Mr. Ivery's jacket. (Tr. at 20, 56; Def.'s Ex. A at ¶ 4.) Officer Linhart acknowledged he had not seen this firearm at any point before he detained and searched Mr. Ivery. (Tr. at 56-58.) At the scene, Mr. Ivery was arrested for felony gun charges and outstanding traffic warrants. (Def.'s Ex. A at ¶ 4.)

### B. The Arguments Below and the Trial Court's Decision

{¶ 25} Following the presentation of all evidence and testimony at the suppression hearing, Mr. Ivery's counsel argued that although Officer Linhart claimed Mr. Ivery was free to terminate the purportedly consensual encounter[3] prior to his flight, the evidence and testimony established that was not true. (Tr. at 70-71.) His trial counsel submitted that no reasonable person would have felt free to terminate the encounter under the facts and circumstances of this case. (Tr. at 70-71.) And, Mr. Ivery's counsel emphasized that, before he ran away, Mr. Ivery tried to disengage numerous times and told the officer he was going home, but Officer Linhart nonetheless continued pursuing and attempting to engage Mr. Ivery. (*See* Tr. at 70-71.) Mr. Ivery's trial counsel argued that, in so doing, Officer Linhart turned "what should have been a consensual encounter into an investigatory detention" for which Officer Linhart admittedly lacked reasonable, articulable suspicion to conduct. (Tr. at 71. *See* Tr. at 34-45, 66.)

{¶ 26} Through his re-direct examination of Officer Linhart, the trial prosecutor conveyed the state's position was the investigatory *Terry* stop did not begin until after Mr. Ivery's unprovoked flight. (Tr. at 60-65.) In closing, however, the trial prosecutor presented no arguments on the issue of whether, assuming the initial encounter was consensual, it became an investigatory stop ***before*** Mr. Ivery began to run away from the officer. (*See* Tr. at 71-75.) Instead, the focus of the state's closing arguments centered on the issue of whether Officer Linhart had reasonable, articulable suspicion (or probable cause) to conduct an investigatory stop of Mr. Ivery ***after*** Mr. Ivery's unprovoked flight. (*See* Tr. at 71-75.) In support, the trial prosecutor cited two cases from this court—*State v. Banks*, 10th Dist. No. 09AP-1087, 2010-Ohio-5714 and *State v. Moyer*, 10th Dist. No. 09AP-434, 2009-Ohio-6777—and the United States Supreme Court's holding in *Illinois v.*

---

[3] Mr. Ivery's trial counsel did not refute the consensual nature of Officer Linhart's initial approach of Mr. Ivery, but instead argued the consensual nature of their encounter ended before Mr. Ivery began running away. (*See* Tr. at 70-71; Sept. 26, 2022 Mot.)

*Wardlow*, 528 U.S. 119 (2000) for the proposition that a person's unprovoked flight during a consensual encounter in a high-crime area justifies the warrantless detention of that person.  (*See* Tr. at 71-75.)  Presuming the entire encounter preceding the flight to be consensual, the trial prosecutor cited several circumstances—in addition to Mr. Ivery's unprovoked flight and "high-crime" area—as supporting Officer Linhart's warrantless detention of Mr. Ivery in this case.[4]  (Tr. at 74-75.)

{¶ 27}  On February 6, 2023, the trial court entered a judgment granting Mr. Ivery's motion to suppress.  In so holding, the trial court found that "even though Officer Linhart's interaction with [Mr. Ivery] ***may have begun*** as a consensual encounter, it is clear from Officer Linhart's body cam video and testimony that the consensual nature of the encounter ended when [Mr. Ivery] began to walk away and clearly did not want to answer Officer Linhart's questions or interact with him."  (Emphasis added.)  (Feb. 6, 2023 Decision and Entry at 7.)  The trial court determined that when Mr. Ivery began to walk away, the officer "should have terminated the encounter" such that "any further pursuit or chase of [Mr. Ivery] by Officer Linhart constituted an unlawful detention and seizure within the meaning of the Fourth Amendment."  (Decision and Entry at 7.)  And, the trial court noted there was no dispute that, at least before the flight, Officer Linhart did not have a lawful basis to detain or stop Mr. Ivery.  (*See* Decision and Entry at 7.)  Accordingly, it ordered all evidence obtained from the warrantless search of his person—namely, the loaded firearm—to "be

---

[4] However, many are not persuasive. The state referenced Mr. Ivery being "outside of a drug house" (Tr. at 74), but the body camera footage showed his vehicle was merely parked on a street in a residential area. Officer Linhart confirmed he did not see Mr. Ivery go inside of the suspected drug house or, for that matter, any foot traffic in connection with the home near Mr. Ivery's parked car. (*See* Tr. at 31-34.) The trial prosecutor also pointed to Mr. Ivery being seated in an idle vehicle "for an extended period of time" while purportedly "watching the traffic intently" and "ducking officers" as factual support for the officer's reasonable suspicion (or probable cause) to detain him after the flight. (Tr. at 74.) But, Officer Linhart did not witness such conduct. (Tr. at 35.) Even if he did, the officer agreed it would be lawful. (Tr. at 29, 33-34.) And we note that, given the reported duration (approximately 30 minutes), time of year (January), and type of vehicles the plain-clothes narcotics detectives who observed his behavior were driving (unmarked), such actions are not indicative of criminal conduct. While agreeing Mr. Ivery was not obligated to speak with Officer Linhart upon his arrival, the state cited Mr. Ivery's immediate departure from the vehicle as another circumstance supporting the warrantless detention. (Tr. at 74.) However, there are plenty of lawful reasons a person would not want to interact with the police, and exercising the precise "freedom to leave" that is often exploited to justify police conduct falls within the bounds of such reasons. The trial prosecutor also contended that sitting in a vehicle he did not own and not having identification on his person somehow, too, were contributing circumstances to the officer's reasonable suspicion (or probable cause) to detain Mr. Ivery (Tr. at 74), even though neither are unlawful. Finally, the state suggested Mr. Ivery "may have been operating the car up to that point," but such notion is clearly speculative. (Tr. at 74-75.) Neither the narcotics detectives surveilling the drug house nor Officer Linhart claimed to have witnessed Mr. Ivery operating the vehicle at any point that day. In fact, its *lack of operation* was cited as a primary reason for the narcotics detectives' suspicion about it. (*See* Tr. at 13-14.)

suppressed and excluded as 'fruit of the poisonous tree.' " (Decision and Entry at 7, quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).)

{¶ 28}  The state timely appealed from the February 6, 2023 judgment, as a matter of right, pursuant to R.C. 2945.67(A), Crim.R. 12(K), and App.R. 4(B)(4).  (Feb. 8, 2023 Notice of Appeal.)  It asserts the following assignment of error for our review:

> THE TRIAL COURT ERRED IN GRANTING [MR. IVERY'S] MOTION TO SUPPRESS.

## II. ANALYSIS

{¶ 29}  In its sole assignment of error, the state contends the trial court erred in finding Officer Linhart's warrantless detention and stop of Mr. Ivery violated the Fourth Amendment to the United States Constitution.  Thus, the state argues the trial court's order suppressing the firearm and all evidence obtained as fruit of the illegal search of Mr. Ivery's person should be reversed by this court. We disagree.

### A.  Standard of Review

{¶ 30}  Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact.  *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶ 14, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.  Thus, an appellate court's standard of review of a trial court's decision denying a motion to suppress is two-fold.  *See, e.g.*, *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 13 (10th Dist.), citing *State v. Reedy*, 10th Dist. No. 05AP-501, 2006-Ohio-1212, ¶ 5, citing *State v. Lloyd*, 126 Ohio App.3d 95, 100-01 (7th Dist.1998).

{¶ 31}  In ruling on a motion to suppress, the trial court first assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses.  *See, e.g.*, *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, ¶ 12, citing *Burnside* at ¶ 8, *State v. Mills*, 62 Ohio St.3d 357, 366 (1992).  Thus, on appeal, we must "accept the trial court's findings of fact if they are supported by competent, credible evidence."  *Id.*, quoting *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982).

{¶ 32}  With respect to the trial court's conclusions of law, however, our standard of review is de novo.  *See, e.g.*, *Banks-Harvey* at ¶ 14, citing *Burnside* at ¶ 8; *State v. Turner*, 163 Ohio St.3d 421, 2020-Ohio-6773, ¶ 14.  *See also Pilgrim* at ¶ 13.  We are tasked with independently determining whether the facts satisfy the applicable legal standard.  *See id.*

{¶ 33} Upon a motion to suppress evidence obtained without a warrant, the state carries the burden of showing, by at least a preponderance of the evidence, that the search and/or seizure fits within one of the defined exceptions to the warrant requirement. *See, e.g.*, *Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1988), citing *State v. Kessler,* 53 Ohio St.2d 204, 207 (1978); *Columbus v. Ellyson*, 10th Dist. No. 05AP-573, 2006-Ohio-2075, ¶ 5, citing *Athens v. Wolf*, 38 Ohio St.2d 237, 241 (1974); *State v. Brandenburg*, 12th Dist. No. CA2020-09-055, 2021-Ohio-2875, ¶ 13.

### B. Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution

{¶ 34} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, protects people against unreasonable searches and seizures. *See, e.g.*, *Banks-Harvey* at ¶ 17, citing *United States v. Ross,* 456 U.S. 798, 825 (1982). It is a restraint on the government and, more narrowly here, law enforcement. *See id.* The Supreme Court of Ohio has held that in felony cases, Article I, Section 14 of the Ohio Constitution provides the same protection as the Fourth Amendment to the United States Constitution.[5] *Id.* at ¶ 16, citing *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, ¶ 12.

{¶ 35} "For a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant." *State v. Moore*, 90 Ohio St.3d 47, 49 (2000). "A search is unreasonable when police lack a valid warrant and no exception to the warrant requirement applies." *State v. Jackson*, ____ Ohio St.3d ____, 2022-Ohio-4365, ¶ 10, citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

---

[5] Although the protections afforded by Article I, Section 14 of the Ohio Constitution have historically been construed as coextensive with the protections of the Fourth Amendment to the United States Constitution, it is well-established that states may "rely on their own constitutions to provide broader protection for individual rights, independent of protections afforded by the United States Constitution." *State v. Robinette*, 80 Ohio St.3d 234, 238 (1997), citing *Arnold v. Cleveland*, 67 Ohio St.3d 35 (1993). And, in certain circumstances, the Supreme Court of Ohio has construed Article I, Section 14 of the Ohio Constitution as providing Ohio citizens with greater protections than the Fourth Amendment to the United States Constitution. *See, e.g.*, *State v. Brown*, 143 Ohio St.3d 444, 2015-Ohio-2438, ¶ 23 (holding that Article I, Section 14 of the Ohio Constitution provides greater protection than the Fourth Amendment to the United States Constitution against searches and seizures made by members of law enforcement who lack authority to make an arrest); *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, ¶ 22 (holding that Article I, Section 14 of the Ohio Constitution provides greater protection than the Fourth Amendment to the United States Constitution against warrantless arrests for minor misdemeanors). *See also State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, ¶ 60, fn. 3 (Donnelly, J., dissenting). *See also id*. at ¶ 14, fn. 1 (DeWine, J., writing for the majority).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." (Footnote omitted.) *Katz v. United States*, 389 U.S. 347, 357 (1967). When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement. *Wolf* at 241.

{¶ 36} To safeguard the rights protected in the Fourth Amendment, the United States Supreme Court has created the exclusionary rule, which precludes the use in a criminal proceeding of evidence obtained in violation of the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 236 (2011), citing *Elkins v. United States*, 364 U.S. 206, 217 (1960). Evidence obtained as the result of an unconstitutional stop, arrest, and/or search must be excluded at trial as "fruit of the poisonous tree." *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963); *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, ¶ 49; *Banks-Harvey* at ¶ 25.

## C. The Stop

{¶ 37} At the outset, we note that Officer Linhart conceded he did not have probable cause to arrest or reasonable suspicion to stop Mr. Ivery when he first parked his cruiser behind Mr. Ivery's idle car or at any point before Mr. Ivery ran away. (*See, e.g.*, Tr. at 34-35, 38-46, 60-67.) And, the parties agreed that Officer Linhart's initial contact with Mr. Ivery began as a consensual encounter. (Tr. at 5, 6, 23.) At issue is whether the challenged seizure was reasonable under the circumstances. Two distinct periods during the encounter are relevant to our analysis: (1) after Mr. Ivery began walking away from Officer Linhart but before he began to run; and (2) after Mr. Ivery began running away from Officer Linhart.

{¶ 38} The state argues the trial court erred in determining that the continued approach by Officer Linhart after Mr. Ivery "began to walk away and clearly did not want to answer Officer Linhart's questions or interact with him"—but before Mr. Ivery's flight—represented a warrantless seizure in violation of the Fourth Amendment to the United States Constitution. (*See* Decision and Entry at 7.) Thus, the state contends that no seizure occurred before Mr. Ivery began running away from the officer. (Appellant's Brief at 11-19.)

Accordingly, we must determine whether the facts in this case support the trial court's finding that Officer Linhart's continued pursuit and questioning of Mr. Ivery **before** he ran away from the officer constituted an unlawful investigative seizure.

### 1. Legal Standards

{¶ 39} Consent is a long-recognized exception to the Fourth Amendment's warrant requirement. *Katz*, 389 U.S. at 357. It is well-established that "law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). "A consensual encounter remains consensual even if police officers ask questions, ask to see the person's identification, or ask to search the person's belongings, provided 'the police do not convey a message that compliance with their requests is required.' " *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 15 (10th Dist.), quoting *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991), and citing *Florida v. Rodriguez*, 469 U.S. 1, 4-6 (1984) and *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984). In this regard, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick* at 437, quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988).

{¶ 40} A consensual encounter becomes a seizure, however, when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion). In *Mendenhall*, the United States Supreme Court set forth several factors which, if present, indicate that a seizure has occurred even if the citizen does not attempt to leave. *See id.* at 554-55. Such factors include the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *See id.* at 554. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut* at 573. Under this objective test, we consider not whether the individual believed he was being ordered to restrict his movement, but whether

the officer's words and actions would have conveyed that to a reasonable person. *Columbus v. Body*, 10th Dist. No. 11AP-609, 2012-Ohio-379, ¶ 14.

{¶ 41} We note the Supreme Court of Ohio "has said little on [this] issue in the last two decades despite changes in police training and public attitudes and increased social tensions, not to mention continued divided opinions on the issue in Ohio's appellate courts." *State v. Kirk*, 158 Ohio St.3d 1527, 2020-Ohio-3017, ¶ 1 (Stewart, J., dissenting from majority's decision not to accept jurisdictional appeal for review), citing *State v. Wertz*, 2d Dist. No. 27376, 2017-Ohio-8766, *appeal not accepted*, 152 Ohio St.3d 1464, 2018-Ohio-1795, and *State v. Scarberry*, 10th Dist. No. 15AP-775, 2016-Ohio-7065, *appeal not accepted*, 149 Ohio St.3d 1419, 2017-Ohio-4038. Thus, Ohio law is not entirely clear "regarding under what circumstances * * * a citizen's consensual encounter with a police officer (during which the citizen is free to leave) become[s] an investigative detention (during which the citizen is not free to leave)." *Id.*

{¶ 42} In contrast to a consensual encounter, a warrantless seizure of a person may be justified as a product of a brief investigatory stop under *Terry*. To justify a *Terry* stop, a law enforcement officer must point to specific, articulable facts which gave rise to a reasonable suspicion that the suspect was engaged in criminal activity. *Terry*, 392 U.S. at 21. *See also State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, ¶ 19-21.

{¶ 43} A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." (Internal quotations omitted.) *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion entails some minimal level of objective justification, 'that is, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *Jones*, 2010-Ohio-2854 at ¶ 17, quoting *State v. Jones*, 70 Ohio App.3d 554, 556-57 (2d Dist.1990). "In evaluating reasonable suspicion to support the propriety of a stop, a reviewing court must consider the totality of the circumstances surrounding the stop as 'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. McCandlish*, 10th Dist. No. 11AP-913, 2012-Ohio-

3765, ¶ 7, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). *See also Terry* at 21-22.

### 2. Analysis

{¶ 44} Upon our review of the record and assuming the encounter began as consensual,[6] we conclude the trial court's finding that the consensual nature ended before Mr. Ivery began to run away from Officer Linhart is supported by competent, credible evidence. (Decision and Entry at 7.)

{¶ 45} While it is true that Mr. Ivery's vehicle was not blocked by the cruiser, it is clear from the conduct of the officer that Mr. Ivery was not free to leave the area. After Officer Linhart parked his cruiser behind Mr. Ivery's lawfully parked car, Mr. Ivery immediately exited his vehicle and began walking away from the officer. At the suppression hearing, Officer Linhart acknowledged that, during this encounter and ***before*** Mr. Ivery began to run, he understood Mr. Ivery "obviously [did not] want to talk to [the officer]" even though Mr. Ivery was answering Officer Linhart's questions while he was in the process of walking away. (Tr. at 18. *See also* Tr. at 67-68.) More pointedly, Officer Linhart testified that "[i]t didn't appear like [Mr. Ivery] wanted to talk to me because he was walking away from me." (Tr. at 40. *See also* Tr. at 67-68.) Nonetheless, despite Mr. Ivery clearly conveying he did not want to engage with the officer and continuing to walk away from him, Officer Linhart followed Mr. Ivery and repeatedly attempted to investigate him anyway. (*See* State's Ex. A; Tr. at 40-41, 67-68.)

{¶ 46} At the hearing, Officer Linhart admitted he did not have a lawful basis to conduct an investigatory seizure of Mr. Ivery at any point before Mr. Ivery began to run. (*See* Tr. at 40-46, 60-61.) And, Officer Linhart conceded that, by continuing to follow and ask Mr. Ivery questions while Mr. Ivery was walking away, he was investigating Mr. Ivery. (*See* Tr. at 40-46.)

{¶ 47} It is true that Mr. Ivery stopped and answered many of Officer Linhart's questions while he was in the midst of walking away. But that fact alone does not mean the entire pre-flight encounter was consensual. On appeal, the state challenges the trial court's factual findings by contending that Mr. Ivery's "actions, up until the point he took off

---

[6] We note that because Mr. Ivery's trial defense counsel agreed the encounter between Officer Linhart and Mr. Ivery began as consensual, the trial court presumed this to be true and did not make any findings of fact or legal determinations on this matter. (*See* Decision and Entry at 7.)

running, in no way show that he does not wish to interact with Officer Linhart." (Appellant's Brief at 16.) But, that claim is belied by Officer Linhart's hearing testimony that, ***prior to Mr. Ivery's flight***, it was obvious to the officer that Mr. Ivery did not want to talk to him. (Tr. at 18, 40-41, 67-68.) As explained above, we defer to the trial court's findings of fact if they are supported by competent, credible evidence. *See, e.g.*, *Burnside*, 2003-Ohio-5372 at ¶ 8.

{¶ 48} Although not required to establish Mr. Ivery's consent to the encounter, we note that Officer Linhart did not ask Mr. Ivery if he would be willing to answer some questions—the assent to which would be clear evidence of choice—upon the officer's initial approach. *Compare State v. Weisgarber*, 2d Dist. No. 27525, 2017-Ohio-8764, ¶ 21; *Florida v. Royer*, 460 U.S. 491, 497-98 (1983). Officer Linhart also did not explain the reasons he sought to question Mr. Ivery. *Compare State v. Thompson*, 2d Dist. No. 26130, 2014-Ohio-4244, ¶ 6-7. Nor did he inform Mr. Ivery at any point during the questioning that he was free to leave. *Compare Scarberry*, 2016-Ohio-7065 at ¶ 46-47 (Sadler, J., concurring in part and dissenting in part). Instead, Officer Linhart—after parking his cruiser behind the vehicle in which Mr. Ivery was lawfully seated and immediately exiting his cruiser—began following and shouting out questions to Mr. Ivery. Officer Linhart admitted he did this because he was trying to investigate Mr. Ivery despite having no reasonable, articulable basis to suspect Mr. Ivery had committed, was in the process of committing, or was about to commit any crime. (*See* Tr. at 31-46, 60-67.) Thus, at this point, Mr. Ivery was well-within his rights to ignore the officer's questions and walk away. And, that is precisely what Mr. Ivery attempted to do.

{¶ 49} In the absence of any context for such questioning, and based on the testimony and evidence presented at the suppression hearing, we conclude that Officer Linhart's tone and compulsory language reasonably suggested the officer expected Mr. Ivery to stop and answer his questions. This is particularly true when combined with the officer's continued pursuit and repeated attempts to question Mr. Ivery even after Mr. Ivery disengaged and walked away at least three times before his flight. And, we agree with the trial court's assessment of the body camera footage as "clearly [showing Mr. Ivery] did not want to answer Officer Linhart's questions or interact with him." (Decision and Entry at 7.)

**{¶ 50}** In the face of Mr. Ivery's repeated efforts to terminate the encounter, then, the intention behind Officer Linhart's continued pursuit and questioning of Mr. Ivery is transparent. His repeated engagement efforts and continued pursuit of Mr. Ivery even after Mr. Ivery had clearly and repeatedly conveyed his intention to terminate the encounter were a means to effectuate an investigatory seizure not supported by reasonable, articulable suspicion. To be sure, Officer Linhart testified that had Mr. Ivery continued walking— rather than running—away, he would have continued to follow and ask Mr. Ivery questions but would not "have pursued him all the way into his apartment." (*See* Tr. at 54-56. *See also* Tr. at 67-68.)

**{¶ 51}** The actions of Officer Linhart thus strongly communicated the message that Mr. Ivery would not be free to leave until Officer Linhart's curiosity was satisfied. Any act of agreement or consent by Mr. Ivery upon Officer Linhart's successive engagements was not voluntarily and freely given, but rather, constituted an acquiescence to a showing of police authority. Mr. Ivery was repeatedly prevented from exercising his right to walk away because, each time he did, Officer Linhart followed and attempted to reengage him. The cumulative, coercive effect of Officer Linhart's conduct vitiated any consent to the encounter that Mr. Ivery could have given, meaning that Mr. Ivery's pre-flight interactions with Officer Linhart's merely served as " 'an expression of futility in resistance to [such] authority.' " *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir.2011), quoting *United States v. Worley*, 193 F.3d 380, 386 (6th Cir.1999).

**{¶ 52}** Affording due deference to the trial court's factual findings and applying an objective test in determining whether the encounter constituted a seizure for purposes of the Fourth Amendment, we therefore conclude that, under the facts and circumstances of this case, a reasonable person would not feel free to "disregard the police and go about his business." *Bostick*, 501 U.S. at 434, quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991). The record thus supports the trial court's finding that the consensual nature of the encounter (during which a citizen is free to leave) between Mr. Ivery and Officer Linhart terminated and became an investigative detention (during which a citizen is not free to leave) ***before*** Mr. Ivery began to run away from the officer. The record also supports the trial court's determination that Officer Linhart did not have reasonable, articulable suspicion for an investigatory *Terry* stop ***before*** Mr. Ivery began running away from the

officer. (*See* Decision and Entry at 7.) Indeed, Officer Linhart admitted as much at the suppression hearing (*see* Tr. at 32-46, 60-66), and his body-worn camera supported that concession (*see* State's Ex. A).

{¶ 53} For these reasons, we find the trial court did not err in concluding that "an unlawful detention and seizure within the meaning of the Fourth Amendment[]" occurred ***before*** Mr. Ivery ran away. (Decision and Entry at 7.)

### D. Good Faith Exception

{¶ 54} Having found the trial court did not err in holding the state failed to establish the warrantless detention or stop of Mr. Ivery's person was constitutionally reasonable, we turn to the issue of whether the trial court erred in suppressing evidence borne out by the subsequent warrantless search as fruit of the poisonous tree.

{¶ 55} "The exclusionary rule bars the use of evidence secured by an unconstitutional search and seizure." *Leak*, 2016-Ohio-154 at ¶ 34, citing *State v. Johnson*, 141 Ohio St.3d 136, 2014-Ohio-5021, ¶ 40, citing *Weeks v. United States*, 232 U.S. 383, 394 (1914) (announcing the exclusionary rule), and *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (extending the exclusionary rule to the states).

{¶ 56} The exclusionary rule is applied to evidence found as a result of an unconstitutional search or seizure when its application will result in appreciable deterrence of Fourth Amendment violations. *See, e.g.*, *Leak* at ¶ 34; *State v. Schubert*, ____Ohio St.3d ____, 2022-Ohio-4604, ¶ 8. Under this doctrine, despite the unlawful seizure of evidence, when "an officer acts with an objectively reasonable, good-faith belief that his or her conduct is lawful, the deterrence rationale for the exclusionary rule loses force," and thus does not support the exclusion of the unlawfully seized evidence. *Banks-Harvey*, 2018-Ohio-201 at ¶ 33. *See also Leak* at ¶ 35, citing *Johnson* at ¶ 50.

{¶ 57} The good-faith exception may apply when an officer conducts an unlawful search or seizure laboring under a mistake of law. *See, e.g.*, *State v. Stadelmann*, 1st Dist. No. C-130138, 2013-Ohio-5035, ¶ 10 (holding that because the officer had a good faith belief that the defendant's turn violated the relevant traffic law, the court properly denied his motion to suppress despite the officer's mistake of law); S*tate v. Gunzenhauser*, 5th Dist. No. 09-CA-21, 2010-Ohio-761, ¶ 16 ("Under limited circumstances, courts have held that the exclusionary rule may be avoided with respect to evidence obtained in a stop based on

conduct that a police officer reasonably, but mistakenly, believes is a violation of the law"); *Heien v. North Carolina*, 574 U.S. 54, 67-68 (2014) (denial of defendant's motion to suppress was proper because officer's mistaken belief that the law required two operating headlights, instead of one, was objectively reasonable based on the circumstances).

**{¶ 58}** However, the good-faith exception is limited. " 'Because courts must be cautious in overlooking a police officer's mistakes of law, the mistake must be objectively reasonable.' " *State v. Reedy*, 5th Dist. No. 12-CA-1, 2012-Ohio-4899, ¶ 18, quoting *Gunzenhauser* at ¶ 16. *See also Heien* at 61, citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

**{¶ 59}** In this case, Officer Linhart acknowledged it was readily apparent that Mr. Ivery did not want to engage with him. He also agreed that, before the flight, he did not have a lawful basis to detain Mr. Ivery or otherwise restrict his movements. And, although Officer Linhart testified Mr. Ivery was free to leave before the flight, his body-worn camera footage and testimony belied that claim. Officer Linhart admitted Mr. Ivery attempted to walk away from him multiple times, but he continued to pursue and question him anyway. Officer Linhart agreed he did this because he was investigating Mr. Ivery even though the officer conceded he had no reason to believe Mr. Ivery was involved in any criminal activity at that time.

**{¶ 60}** For these reasons, we find Officer Linhart's belief that he was authorized to continue to follow, question, and investigate Mr. Ivery when it was obvious to him that Mr. Ivery did not consent to such encounter is not sufficiently reasonable to trigger the protection of the good-faith exception. Accordingly, we conclude the warrantless search of Mr. Ivery's person was unreasonable and thus violated the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution. Because the firearm was a fruit of that unconstitutional search, the trial court properly suppressed it. *See Xenia*, 37 Ohio St.3d at 219; *Wong Sun*, 371 U.S. at 487-88.

**{¶ 61}** Accordingly, we overrule the state's sole assignment of error.

## III. CONCLUSION

{¶ 62} Having overruled the state's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and BOGGS, JJ., concur.